UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

| | |
|---|---|
| ABDUL-AZIZ RASHID MUHAMMAD, <br> a/k/a William Anthony Brown, <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Civil Action No. 08-CV-131-KKC <br><br><br> **MEMORANDUM OPINION <br> AND ORDER** |

\*\*\*\*\*   \*\*\*\*\*   \*\*\*\*\*   \*\*\*\*\*

Abdul-Aziz Rashid Muhammad ("Muhammad") is an inmate confined at the Federal Correctional Institution in Butner, North Carolina ("FCI-Butner"). Muhammad filed this *pro se* civil action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. [R. 2] Defendant United States of America has filed a Motion for Summary Judgment [R. 19] and Muhammad has filed his Response thereto. [R. 24] This matter is therefore ready for decision.

I.   **FACTUAL BACKGROUND**

Muhammad indicates that on August 20, 2006, he told Nurse Helton - who was administering injections of interferon to treat his Hepatitis C - that he had two painful sores on his thighs. Helton looked at the sores and told Muhammad that they appeared to be spider bites, which he should treat by placing a hot compress on the sores. A few days later, Muhammad again complained about the sores to Nurse McIntyre, who also advised him to use a hot compress, but indicated that Muhammad should come to sick call if the sores became worse.

By August 26, Muhammad's leg was "hot, was hurting badly, bleeding and pus coming from wounds that had grown bigger and had busted." While Muhammad requested further attention

when he came to the pill line to receive his medications, Physician's Assistant Sexauer told him that he could not help him at that time but that he should come to sick call. Muhammad indicates that he expressed concern that he had contracted Methicillin-resistant *Staphylococcus aureus* ("MSRA"), a form of staph bacteria that is extremely resistant to treatment by standard antibiotics. Medical staff told him that this was not so, and that he should continue to treat the sores as previously directed.

On August 30, 2006, in the early morning Muhammad was climbing up some stairs when his right knee "gave out" causing him to fall down hard onto the stairs. During the fall, Muhammad threw his hands out in front of himself in order to prevent hitting his face, but badly injured his left wrist in the process. Officer Hamilton observed his fall and offered to send him to the medical department for examination, but Muhammad indicated he would ask to be examined when he went to the medical department to pick up his pills later that morning.

When he went to the pill line, Muhammad advised staff of his fall, but was told that he would not be examined at that time because his injury was not sufficiently serious, and that he should make an appointment to be seen at the next sick call. Muhammad protested to nurse Runyan that he was experiencing strong pain in his wrist, and that any movement was causing sharp pains, but she merely reiterated that he would have to be seen at sick call. It appears that prison staff, including the medical department, experienced difficulties maintaining normal operations because U.S.P.-Big Sandy was frequently on "lockdown" status because of violence or disorder at this prison beginning in June 2006 through at least December 2006. Muhammad asserts that medical staff repeatedly refused to provide treatment for his injured wrist, although it is not clear whether he requested this treatment at the pill line or was additionally refused to be seen at sick call.

Nurse Spradlin conducted a brief examination of Muhammad's wrist on Sunday, September

2

3, 2006, which did not show signs of a broken bone or excessive swelling. It appears Spradlin administered minor first aid, applied an ACE bandage to help immobilize his wrist, gave Muhammad an ice pack which he could apply to reduce the swelling, and gave him some Motrin for the pain. Finally, Spradlin advised Muhammad that he should report to sick call the next day for further examination.

However, when Muhammad asked to be examined on the following day, medical staff again refused to see him because his condition was not an emergency, and again refused to see him on Tuesday, September 5, 2006. Later that day, Muhammad approached Warden Hastings regarding the situation. The warden directed medical staff to immediately perform a medical assessment, and Muhammad was escorted to the medical department at that time. Dr. Conrotto examined the sores on Muhammad's thigh, and took a blood and tissue sample for testing. Based on a preliminary assessment that the sores were, in fact, the result of a staph infection, Conrotto prescribed both oral and topical antibiotics. Muhammad alleges, notwithstanding Ramirez's assertions to the contrary, that he received neither examination of or treatment for the injury to his wrist. Muhammad seems to acknowledge that an X-ray was taken of his left wrist at that time, which when subsequently reviewed, showed no broken or dislocated bones in his wrist.

Thereafter Muhammad made repeated requests to be examined and provided at least pain medication for the injury to his wrist. However,

> every time before Muhammad's sick call appointment would be attempted, the prison would be locked down again 24 hours a day and during these periods no one received sick call until prison was re-opened, if you were not dying, you were not seen, only the insulin[] patient's [sic] got there medicine.

[R. 24 at pg. 21] Muhammad indicates that he sought further medical attention for his wrist

3

throughout October, November, and December 2006, but because the prison remained on lockdown status, medical personnel provided little if any care to inmates other than dispensing prescription medication. According to Muhammad, direct requests for additional treatment were either explicitly rejected by staff for anyone suffering injury short of an emergency, or were simply ignored.

Muhammad continued to complain of pain in his wrist throughout this period, and as a result a second X-ray was taken of his left wrist on December 5, 2006. This X-ray again revealed that there was no fracture or dislocation to his wrist. Dr. Ramirez appears to have concluded that Muhammad was a malingerer, and entered an Administrative Note on December 5, 2006 which stated:

> Patient was observed in the dining hall. He came to the dining room at lunch, using/waving his hands, [no] problem [with] gait, walking at rapid pace. Retrieved tray [without] problem, no grimace noted on face, easily moved hand for eating. Was noted to use napkin, wiping hands [in] drying motion [without] difficulty, fed himself [without] difficulty. Upon leaving, shook hands with others with right hand and patted others on back with both hands.

[R. 24-16 at pg. 5] While Muhammad continued to request additional or stronger pain medication, a December 8, 2006, note in his medical records indicates a strong concern on the part of the medical staff that, in light of Muhammad's compromised immune system, the chronic use of non-steroidal anti-inflammatory medications (NSAIDs) to address his pain presented a potentially unacceptable risk of kidney or liver damage or ultimately renal failure.

On December 14, 2006, Muhammad was transferred to FCI-Butner in North Carolina. After continued complaints of pain, medical staff took an MRI of his left wrist on January 30, 2007. The results indicated that Muhammad had no broken or dislocated bones, but suffered from "tenosynovitis, tendonitis, and at least partial tears involving the tendons in the first extensor compartment as above. Associated inflammatory changes/soft tissue edema in the surrounding

4

tissues." Medical records indicate that physicians at that facility treated the injury and associated pain conservatively through medication and steroid injections for seven months, before ultimately determining that surgery would be beneficial, which was performed on September 10, 2007.

On July 30, 2007, Muhammad sent a letter to the BOP requesting administrative settlement of his claims of medical malpractice under the FTCA in the amount of $900,000. The BOP denied that request by letter dated January 9, 2008, concluding that Muhammad received medically reasonable and appropriate care.

Muhammad filed his FTCA Complaint in this action on June 23, 2008. [R. 2] Liberally construed, Muhammad's claims are that BOP medical staff (1) failed to promptly and correctly diagnose the sores on his thigh as a staph infection; (2) failed to promptly and correctly diagnose the injury to his left wrist as tendonitis; and (3) failed to provide him with medication to adequately address the pain resulting from his wrist injury. [R. 24 at pgs. 8-9, 28]

## II. DISCUSSION

### A. Summary Judgment Standard.

Rule 56 requires the entry of summary judgment for the moving party if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992). The rule permits a defendant to challenge the viability of the plaintiff's claim by asserting that at least one essential element of plaintiff's claim is not supported by legally-sufficient evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). The defendant does not need present his own evidence to support this assertion, but need only point to the absence of evidence favoring the plaintiff. *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005). In response, the plaintiff

cannot rely upon allegations in the pleadings, but must point to evidence of record in affidavits, depositions, and written discovery which demonstrate that factual questions remain for trial. *Hunley v. DuPont Auto*, 341 F.3d 491, 496 (6th Cir. 2003). If the totality of the evidence submitted -- viewed in a light most favorable to the plaintiff with the benefit of any reasonable factual inferences which can be drawn in his favor, *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005) -- "would require a directed verdict for the moving party," summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). If the applicable substantive law requires the plaintiff to meet a higher burden of proof, his evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial. *Harvey v. Hollenback*, 113 F.3d 639, 642 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993).

B. Federal Tort Claims Act.

Under the FTCA, the United States is "liable in tort for certain damages caused by the negligence of any employee of the Government 'if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Johnston v. United States*, 85 F.3d 217, 219 (5th Cir. 1996) (quoting 28 U.S.C. § 1346(b)). Thus if a federal employee's conduct in Kentucky would render him or her liable for negligence under Kentucky law, the United States may be held accountable in tort under the FTCA.[1]

---

[1] Muhammad suggests that under *United States v. Muniz*, 374 U.S. 150 (1963), "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule." *Id.* at 165. The quoted passage is found in the Supreme Court's discussion finding that the United States may be liable for the negligence of federal prison officials notwithstanding state law rules immunizing their state counterparts from liability. Properly understood, the passage indicates the Supreme Court's understanding that Section 4042 reinforces the *existence* of a duty of care notwithstanding state immunity, whereas the *scope* of that duty remains fixed by the law of the jurisdiction where the events complained of occurred. This rule is established by the text of the statute itself, and was reinforced in *Rayonier, Inc. v. United States*, 352 U.S. 315 (1957), a case cited with approval in *Muniz*.

In *Heavrin v. Jones*, Ky.App., 2003 WL 21673958 (2003), the Kentucky Court of Appeals set out the elements of a cause of action for medical malpractice under Kentucky law:

> To establish a prima facie case of medical malpractice, a plaintiff must introduce evidence, **in the form of expert testimony**, demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a proximate cause of the plaintiff's injuries.

*Id.* at *2 (emphasis added); *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982).

In its motion for summary judgment [R. 19], the United States contends that Muhammad was provided with prompt and appropriate medical treatment for both medical conditions under Kentucky law, and that Muhammad has failed to state a prima facie case of medical malpractice because he has not supported his claim that his treatment fell below the standard of care with expert testimony as required by Kentucky law. In his response [R. 24], Muhammad contends that under Federal Rule of Civil Procedure 56(f) the motion is prematurely filed until he has had a chance to obtain written or deposition discovery from the defendants; that expert testimony is not required under the doctrine of *res ipsa loquitur*; that if expert testimony is required, the Court should appoint an expert witness for him under Federal Rule of Evidence 706 and the *in forma pauperis* statute, 28 U.S.C. § 1915; and that the evidence of record demonstrates that defendants were negligent.

  B. <u>Muhammad has not demonstrated reason to delay consideration under Rule 56(f)</u>.

As a threshold matter, Muhammad challenges the Defendant's motion for summary judgment as prematurely filed, arguing that he has not been afforded sufficient time to conduct discovery to obtain information favorable to his claims, and indicating his desire to obtain written or testimonial discovery from each of the health care professionals who treated him at U.S.P.-Big Sandy. [R. 24 at pg. 25]

Federal Rule of Civil Procedure 56(f) provides:

If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

In evaluating a motion under Rule 56(f), the Court is mindful that granting summary judgment is improper where the nonmovant is not given an adequate opportunity for discovery. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627-28 (6th Cir. 2002); *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231-32 (6th Cir. 1994).

However, Rule 56(b) provides that a defendant may move for summary judgment at any time, and thus the fact that the United States did so at any early stage in the proceedings does not, of itself, provide any basis to delay consideration of the motion. Further, a party seeking to delay consideration pursuant to Rule 56(f) must file an affidavit which (1) specifically details the discovery needed and (2) demonstrates specific reasons why the nonmovant cannot oppose the summary judgment motion without it. *United States v. One Harrington & Richardson Rifle*, 378 F.3d 533, 535 (6th Cir. 2004). General and conclusory assertions that more discovery is needed are not enough: the affidavit must be detailed and specific. *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004); *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003) (nebulous assertions of additional time for discovery are insufficient). Not only must the nonmovant explain why the facts it seeks are material, it must explain why it has not previously discovered the information. *Toms v. Taft*, 338 F.3d 519, 523-24 (6th Cir. 2003) (more time for discovery not warranted where party sought

information that was not relevant to dispositive question); *Ball*, 385 F.3d at 720; *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) ("Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.").

Muhammad has offered no explanation of what specific information he needs or expects to obtain from the discovery he seeks that is not already in the record, nor how such discovery is necessary to refute the contentions made by the United States in its motion. More specifically, Muhammad does not explain how the testimony of the healthcare providers at Big Sandy would support, rather than undermine, his challenge to the medical sufficiency and appropriateness of the care that they themselves provided, nor how it would provide him with the expert medical testimony required to support his case. Absent a more particularized explanation of the need for more time to refute the contentions of the United States' motion, Muhammad's request to delay consideration of the motion must be denied.

    C.    <u>Res Ipsa Loquitur does not apply to Muhammad's claims</u>.

In response to the United States' contention that Muhammad must provide expert testimony to support his allegation that the medical care he received fell below the applicable standard of care, Muhammad first argues, in essence, that his claims are such that "any layman is competent to pass judgment [on them]," thus obviating the need for expert testimony. This notion is embodied in the doctrine of *res ipsa loquitur*, a Latin phrase meaning "the thing speaks for itself." In cases where it applies, the doctrine excuses the need to establish a deviation below the standard of care with expert testimony. *Keel v. St. Elizabeth Medical Center*, 842 S.W.2d 860, 862 (Ky. 1992).

9

However, the doctrine first developed in more ordinary contexts of tort law, such as those involving the maintenance of inherently dangerous conditions, and has been imported into medical negligence cases with reluctance and considerable caution. *See, e.g., Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990) ("There are only very, very few instances where a pleading of *res ipsa loquitor* is applicable in medical malpractice cases.") (noting examples of this exception include negligence in the use of mechanical instruments, operating on the wrong portion of the body, or leaving surgical instruments or sponges inside the body). Because medicine is a very specialized field practiced by highly educated and trained individuals, the circumstances where a person untrained in the art may make a viable determination of negligence without the assistance of one versed in its practices are few and far between. *McCarty v. Boswell*, 2003 WL 1339409, **8 and n.35 (Ky.App. 2003) (holding that *res ipsa loquitur* does not apply to a mistake in diagnosis in reviewing pathology slides, and noting that where the doctrine has been applied in medical malpractice cases, it is only where the mistake was palpable and physically obvious, as where the physician failed to obtain informed consent, perforated an extraneous tissue during surgery, left a scalpel in the patient's bladder, or broke a bone during a procedure) (collecting cases).

In the present case, Muhammad asserts that health care providers at Big Sandy should have more quickly determined, either by casual observation or through additional testing, that the sores on his thigh were not spider bites but a staph infection; that although his left wrist was not broken that he suffered nonetheless from tendonitis; and that additional or stronger pain medication was warranted. None of these claims are of a type which a layperson could reasonably evaluate without the assistance of expert testimony.

With respect to the medical staff's diagnosis of Muhammad's staph infection, the Court is

unaware of any basis in common knowledge to differentiate between sores caused by spider bites and those incidental to a staph infection, or of any symptoms attendant to a staph infection which would readily indicate to nurses that a staph infection was present.  Nor was the Court able to locate a single case where a court determined that *res ipsa loquitur* applied to the contraction or proper diagnosis of a staph infection, and many which indicate the contrary.  *See, e.g., Mahan v. Bethesda Hosp., Inc.*, 617 N.E.2d 714 (Ohio App. 1992) (plaintiff's contraction of staph infection following surgery did not warrant application of *res ipsa loquitur* doctrine); *Bartlett v. Argonaut Ins. Companies*, 523 S.W.2d 385 (Ark. 1975) (same); *Hoffman v. Pelletier*, 775 N.Y.S.2d 311 (N.Y.A.D. 2004) (same).

The same is true with respect to the diagnosis and treatment of what turned out to be tendonitis in Muhammad's left wrist. Muhammad requested medical attention for his wrist following a fall, and the medical staff responded by manually checking his wrist for signs of a broken bone or other trauma followed by an X-ray to ensure that no bones were broken.  When Muhammad continued to experience pain, a followup X-ray was performed in December 2006, which again revealed no break or trauma to the wrist.  While Muhammad contends more urgent or aggressive diagnosis and treatment was warranted, his disagreement, or even that of another physician, with the care actually provided does not make the issue of the sufficiency of that treatment one which a layperson could decide.  *Warden v. United States*, 861 F.Supp. 400, 403 (E.D.N.C. 1993), *aff'd*, 25 F.3d 1042 (4th Cir. 1994) (dismissing inmate's FTCA claim for failure to provide required expert testimony where physician's assessment that prisoner's condition was not an emergency was not a matter susceptible of decision as a matter of common knowledge, thus, *res ipsa loquitur* does not apply); *Walls v. Boyett*, 226 S.W.2d 552 (Ark. 1950) ("Such questions as whether the plaster cast

should have been placed on the fractured arm, x-rays made, or an operation performed were obviously issues requiring scientific knowledge to determine.") (*cited with approval in Turner v. Reynolds*, 559 S.W.2d 740 (Ky.App. 1977)).

Finally, there is no question that a physician's decisions regarding management of pain, particularly for a patient with functional deficiencies in his liver and kidney, is not a matter susceptible to determination without the assistance of expert testimony. *Boone v. Williams W. Backus Hosp.*, 864 A.2d 1, 19-20 (Conn. 2005) (physician's "calculated risk" in administering medication to penicillin-sensitive patient is precisely kind of situation which requires, rather than excuses, expert testimony); *Miller v. Afruma*, 2004 WL 1110516 (Cal.App. 2004) (physician's decision to treat myopathy with prednisone was not a matter of "common knowledge" to permit use of *res ispa loquitur* inference); *Crum v. United States*, 2009 WL 693262, \*\* 8 (W.D.Pa. 2009) ("the mere fact that Plaintiff has found it necessary to resort to a medical textbook to support his claim is a clear indication that the act of prescribing medication is more than a "simple matter" that would fall within the realm of a jury's "common experience."").

Because a layperson would not be qualified to make a viable assessment whether the medical care Muhammad received satisfied the applicable standard of care, Kentucky law requires Muhammad to support his claim that it was not with expert testimony.

D.  The Court will not appoint an Expert Witness for Muhammad.

Muhammad finally argues that, if expert testimony is required, the Court should appoint an expert witness pursuant to Federal Rule of Evidence 706. In support of his request, Muhammad argues that he is unable to obtain supporting expert testimony without such an appointment because (1) he lacks the funds to hire an expert witness, and (2) even if he could afford one, the BOP would

not allow an outside physician to examine him in prison.

With respect to the latter argument, while it may be correct that the BOP would refuse to permit an outside physician to examine Muhammad absent a court order, there is no reason to believe that such an examination would be necessary for a physician to formulate a professional opinion regarding the adequacy of diagnosis and treatment provided by BOP medical staff nearly three years ago. While a current examination might be necessary to determine the extent of Muhammad's recovery, for example to determine damages, the issue of liability is predicated upon care provided in the past, something which would, in all probability, be determined from a review of the relevant documentary medical record. In addition, Muhammad has not indicated that he requested permission from the BOP for such an examination, and the BOP's refusal of such a request therefore remains a matter of speculation.

With respect to the former argument, while it is true as a general proposition that Federal Rule of Evidence 706 permits the Court to appoint an expert witness, "it is against the common-law tradition for the court to get involved in the process of actually digging out evidence. ... it is the responsibility of the parties to produce the evidence while the court looks on to assure that the rules are followed." Weinstein's Federal Evidence § 706.02[1]. This does not mean the Court would never make such an appointment, but only that doing so would occur in only extraordinary circumstances, and the costs for such services are shared by the parties, to be apportioned by the Court only after a trial. Even were the Court inclined to appoint an expert witness for the express purpose of providing the plaintiff with the evidence that he is required to produce as part of his *prima facie* case, the question of paying for those services would be problematic: the *in forma pauperis* statute, 28 U.S.C. § 1915, does not provide a basis for their compensation, *Rittner v. Thrower*, 2007

WL 756704 (S.D.Ohio 2007)(citing *Pedraza v. Jones*, 71 F.3d 194, 196 (5th Cir. 1995); *Boring v. Kozakiewicz*, 833 F.2d 468, 474 (3rd Cir. 1987), and the Court may not authorize the expenditure of public funds absent express congressional authorization, *United States v. MacCollum*, 426 U.S. 317, 321 (1976). Simply put, a plaintiff must bear the often substantial costs attendant to prosecuting a medical malpractice case.

The Court therefore concludes that, because the claims asserted by Muhammad must be supported by expert testimony which establishes a deviation from the standard of care, and because Muhammad has not provided such expert testimony nor offered a legally-sufficient justification for his failure to do so, he has failed to establish a prima facie case of medical malpractice under Kentucky law. Accordingly, the United States' motion for summary judgment must be granted and his claims dismissed with prejudice. *Andrew v. Begley*, Ky.App., 203 S.W.3d 165 (2006) ("To survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper.")

### III. CONCLUSION

Accordingly, **IT IS ORDERED** that:

1. The Motion for Summary Judgment filed by Defendant United States of America [R. 19] is **GRANTED**, and Plaintiff's Complaint [R. 2] is **DISMISSED WITH PREJUDICE**.

2. The Court will enter an appropriate Judgment.

Dated this 28th day of September, 2009.



**Signed By:**
*Karen K. Caldwell* KKC
**United States District Judge**